**MORRISON–HARDEMAN–PERINI–LEAVELL**

v.

**The UNITED STATES.**

No. 378–65.

United States Court of Claims
April 19, 1968.

John L. Kilcullen, Washington, D. C., attorney of record, for plaintiff. Mc-Nutt, Dudley & Easterwood, Washington, D. C., of counsel.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with direction to make his recommendation for conclusions of law on plaintiff's motion and defendant's cross-motion for summary judgment under Rule 54(b). The commissioner has done so in an opinion and report filed on January 29, 1968 wherein such facts as are necessary to the opinion are stated. Plaintiff has filed no request for review of the commissioner's opinion, report and recom-

mended conclusion of law and the time for so filing pursuant to the rules of the court has expired. On March 5, 1968 defendant filed a motion requesting that the court adopt the commissioner's report as its decision in the case. Since the court agrees with the commissioner's opinion, with a minor modification, and the report and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same, as modified, as the basis for its judgment in this case without oral argument. Therefore, plaintiff is not entitled to recover, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and the petition is dismissed.

## OPINION OF COMMISSIONER

GAMER, Commissioner.

Plaintiff's claim, in the amount of $666,740, is for increased labor costs incurred during its performance of a $74,000,000 contract, dated March 20, 1962, for the construction of Minuteman missile facilities.[1] The project was located in a 14-county area in western Missouri in and near the Whiteman Air Force Base. Plaintiff contends that, with respect to certain of the contract work, defendant caused it to pay its operating engineers and carpenters rates higher than those called for by the contract, thus entitling it to an equitable adjustment. The contracting officer[2] denied the claim, and, after a hearing, the Armed Services Board of Contract Appeals affirmed the denial (ASBCA No. 10111). By motion for summary judgment, plaintiff here seeks, on the basis of the record and proceedings before the Board, to reverse such Board action.

Uninterrupted operations at missile sites and the avoidance of work stoppages interfering therewith being considered "vital to our national security,"

and after obtaining pledges of "cooperation" from "manufacturers, construction concerns and labor unions involved in the missile and space programs," there had been created, by Executive Order No. 10946 of May 26, 1961, "Establishing a Program for Resolving Labor Disputes at Missile and Space Sites" (26 F.R. 4629), a Missile Sites Labor Commission "[f]or the purpose of developing policies, procedures, and methods of adjustment for labor problems at missile and space sites * * *." The Secretary of Labor was designated as the Chairman of the Commission, the other members being the Director of the Federal Mediation and Conciliation Service (Vice-Chairman), and three representatives each from the public, labor, and management, all to be designated by the President (Sec. 1). The Commission was required to establish "at each missile or space site" a Missile Site Labor Relations Committee, whose primary function was "to anticipate impending problems and to arrange for proper disposition of them prior to the time that such problems become acute * * *." (Sec. 2.) Failing a solution of "any labor relations problem at any missile or space site" either by "voluntary settlement procedures already in existence" or by the local Committee, the Commission was required to "establish such procedures as appear to it necessary and appropriate to produce a satisfactory settlement of such problem * * *." Although it was authorized to establish special panels, to hold hearings, "to make findings of fact," to "make recommendations for the settlement" of disputes, to attempt to have them arbitrated, to itself mediate them, and "to issue such directives and to take such other action as the Commission may direct" (Sec. 4), including the making of "recommendations" to government agencies, labor organizations, and employers (Sec. 6), it was given no enforcement powers.

---

1. Plaintiff is a joint venture consisting of Morrison-Knudsen Company, Inc., Paul Hardeman, Inc., Perini Corporation, and C. H. Leavell & Company.

2. The contracting agency was the Corps of Engineers Ballistic Missile Construction Office, Department of the Army.

In accordance with the Davis-Bacon Act (40 U.S.C. § 276a et seq. (1958)), the Secretary of Labor had determined the prevailing wage rates for the Whiteman project, which rates, composed of separate sets for each county, were set forth in 57 pages at the end of the part of the contract designated as "Part II, Special Conditions," Section SC–6a thereof providing that such rates (i. e., "determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the pertinent locality") should be "[t]he minimum wages to be paid laborers and mechanics on this project * * *," and with Section GC–12 of "Part I, General Conditions" requiring weekly reports to the contracting officer showing compliance with such payment requirement. Under the Act, failure to comply could be met by the withholding from the contractor of amounts equal to the difference between the wages paid and the minimum contract rates as well as by the suspension of all further payments to the contractor.

The Secretary of Labor's prevailing wage determination (issued on March 8, 1962, and incorporated in the invitation for bids by "Addendum No. 7" issued March 9, 1962, of which plaintiff was advised by telegram on March 10, 1962, with the bids to be opened March 15, 1962) set forth for each area two separate schedules of wage rates, one under the heading of "Highway and Heavy Construction," and the other under the heading "Building Construction."

In each instance the following definitions of these categories were set forth:

Highway and Heavy Construction— All work with the exception of building construction, including preparation, grading, and improvement of property or sites, including streets and highways. Building construction is defined to include building structures intended for use for shelter, protection, comfort or convenience.

For the operating engineers and carpenters herein involved, the "Building Construction" rates were higher than the "Highway and Heavy Construction" rates. Thus, the wages payable to them on any particular part of the project, except for "preparation, grading and improvement of property or sites," which was, in the definition, specifically classified as "Highway and Heavy" construction, would depend upon whether such part would be properly classified as "Highway and Heavy" or "Building" construction.[3]

Shortly after the issuance of the notice to proceed on April 2, 1962, plaintiff commenced hiring the required labor, consisting, at the beginning, primarily of the operating engineers, who were obtained through the pertinent local of the Operating Engineers Union, and who were referred to plaintiff by the union at the "building" construction rates. However, as a result of plaintiff's questioning the proper "heavy" or "building" classification of certain parts of the project, a conference between plaintiff and the union was held on April 9, 1962.

The project included 15 launch control centers and 150 launchers (10 to

3. The determination superseded one issued February 12, 1962, which in turn superseded one that had been issued on January 19, 1962.

The first wage determination of January 19, 1962, had two classifications, "Building Construction" and "Preparation, grading and improvement of property or site, including streets and highways." Power equipment operators were listed under each, the "building" rates being higher. Bd.Op., p. 6; App.Ex. A–4.

The second wage determination of February 12, 1962, was substantially the same, but added another category entitled "Preparation, grading and improvement of property or site, including streets and highways and the excavation for the foundations," under which classification truck drivers were listed (as well as under "Building Construction"). App.Ex. A–5.

a center). In the centers were living quarters, kitchens, and other facilities for the personnel responsible for manning the project. Plaintiff conceded that the "building" rates were applicable to the construction of these structures. However, it took the position that the "heavy" rates were properly applicable to the construction of the 150 launchers. These structures, located underground, in essence took the form of a narrow, deep steel-lined shaft (to be used for the storage of missiles, and sometimes referred to as a "silo"), requiring a large amount of excavation. The top of the shaft, however, widened to provide the necessary area for the launching equipment. There were no living quarters or other facilities related to human habitation in the structures, although they were, of course, suitable for maintenance operations.

Plaintiff argued that, based on historical origin and current general interpretation in the construction industry, "highway and heavy" construction, of which roads, dams, bridges and mine shafts were cited as examples, referred to work involving the excavation and moving of large quantities of earth and rock, the pouring of concrete, and backfilling. The launcher structures, it contended, fitted this concept. In general, the construction consisted of first excavating, by such equipment as scrapers, back-hoes, gradalls, and drilling equipment, the wider top section to the depth where the narrow part of the shaft began. Thereafter, the narrow shaft was excavated. This required much hand labor, and was characterized as resembling a mining operation. Concrete was then poured in the bottom of the shaft, the long steel liner inserted, the shaft backfilled, and concrete then poured for the wider top section, which was to contain the launching equipment. (A poured concrete support building near each launcher contained additional equipment.) On the other hand, the launcher did not, plaintiff contended, from the construction industry viewpoint, fit into the contract "building" definition, i. e.,

a structure "intended for use for shelter, protection, comfort or convenience," since, it claimed, the industry comprehended only structures for the shelter and protection, whether as living or working quarters, of people or animals. Structures falling within the industry "building" concept, it further argued, are normally characterized by architectural features (doors, windows, decoration) not generally found in nonhuman or nonanimal quarters, and which were, similarly, absent from the underground launchers.

The union, however, was less interested in historical origins of terms and broad industry concepts than in what it contended was the settled practice in the particular area of Missouri over which it had jurisdiction and in which the project lay. It took the position that in such territory, the construction of structures such as the launchers, containing steel liners, complicated launching equipment, and large quantities of intricate electrical equipment and devices, was considered as "building" construction, not only because of their nature but also because of their purpose, i. e., the housing and the protection of expensive missiles as well as such equipment. The local agreements between the unions which would be supplying the principal types of labor required for the project and the Associated General Contractors of Missouri (of which plaintiff was a member) also distinguished between building and other types of construction, the Common Laborers' and Teamsters' agreements specifically covering and containing definitions of "building construction" which were substantially identical with that contained in the minimum wage schedules of plaintiff's contract, and the Operating Engineers' agreement specifically excluding "building construction" but again defining such construction substantially in the identical manner. These agreements were obviously the source of the Secretary of Labor's prevailing wage determinations, and the union therefore insisted that by local practice under the local agreements, the

launchers would be considered as falling within the "building" classification.[4] The union further pointed out that on three previous missile projects in its jurisdictional area, i. e., the Atlas projects at the Forbes, Schilling, and McConnell Air Force Bases in Kansas, its operating engineers had been paid, under the dual rate wage determinations that had been issued for those projects, the "building" rate for the work involved in the construction of the launchers, thus establishing an area practice for this type of work to be performed at such rates.[5] In addition, the union argued that plaintiff had long known of the local practices and interpretations as a result of two precontract meetings that plaintiff had held with it (and the other interested unions) on February 14 and 26, 1962, shortly after the project was first announced, and at which meetings the union had asserted that it would expect its members to be paid the "building" rates for the launcher construction, as had been the situation at Forbes, Schilling, and McConnell. However, plaintiff argued that these Atlas projects involved a type of construction which it considered to be significantly different from the instant Minuteman project, that none of the other wage determinations contained a definition of "Building Construction" such as was included in the Whiteman determination, and that the February meetings had been held prior to the issuance on March 9, 1962 of the "Addendum No. 7" wage determination containing the definition in dispute (the then prevailing wage determination, which "Addendum No. 7" superseded, not containing such a definition).

Thus, with the union insisting that, except for site-clearing and road construction operations, its members be paid the building construction rates for all of the project work, including the launchers, and plaintiff, for the reasons stated, rejecting such demand, an impasse was reached. Immediately thereafter the operating engineers left the job, and plaintiff thereupon promptly gave the notice required under Section 23 of the contract's General Provisions of the existence of a labor dispute.

On March 28, 1962 (approximately two weeks before the work stoppage of April 9), the local Whiteman Air Force Base Missile Site Labor Relations Committee, established under Executive Order No. 10946, had held its first meeting, with both plaintiff and the Operating Engineers Union in attendance. At such meeting, the difference of opinion concerning the wage rate problem had become evident and the Chairman of the Committee, a federal mediator, suggested

4. The Operating Engineers' Agreement excluded building construction "for the reason that building construction is separate and distinct * * *." (App.Ex. A–2, p. 5.) However, "building construction" was defined in the Agreement "to include building structures, including modifications thereof or additions or repairs thereto, intended for use for shelter, protection, comfort or convenience. Building construction shall include the demolition of, and foundations for, building construction; however, the preparation, grading and improvement of the property or site shall be covered by this Agreement in all areas of the state except within the city limits of St. Joseph, Jefferson City, St. Charles, Columbia, Springfield, and Joplin." (P. 26.) This agreement had expired on April 1, 1962, but a new agreement was in the process of negotiation. Such an agreement was formulated and became effective May 1, 1962, App.Ex. A–3, p. 35.

5. There were two separate determinations for Forbes, one covering "Heavy Type Construction: Consisting of Site Grading, Water Wells, Water Supply System and Drainage," and the other covering "General Building Construction: Consisting of Construction of Missile Launching and Operational Facilities." For both Schilling and McConnell there was only one determination for the work which was described as "General Building Construction: Consisting of Construction of Missile Launching Facilities, Security Fence, Roadways and Drainage," but two schedules of rates were contained therein for power equipment operators, one for "Site Preparation and Grading" work, and the other for "Building Construction" work. Bd.Op., pp. 5–6 (contained in Rec., Vol. 1).

that any problem which plaintiff and the union could not resolve between themselves by direct negotiation be submitted to the Committee. Both the union and plaintiff advised the Committee they would, by conference, attempt to reach an agreement on the "heavy" vs. "building" rate issue. However, such attempt at the meeting held on April 9, 1962 failing, as above-described, with the work stoppage thereupon resulting, the Committee immediately referred the matter to the Commission in Wahington, D. C., and the next day, April 10, 1962, the Commission advised that it had made arrangements for a hearing to be held before the Commission's Construction Panel in Washington on April 12, 1962.

On April 11, 1962, the local Committee again met, with plaintiff and the Operating Engineers Union in attendance, as well as the Carpenters Union, which also insisted on the "building" rates for the launcher structure work. The Committee's immediate concern, however, was to work out some arrangement whereby work could be promptly resumed by the operating engineers, and an agreement was arrived at whereby (a) wages for work prior to the work stoppage would be paid at the "heavy" rates; (b) wages paid for work while the dispute was pending before the Commission would also be paid at the "heavy" rates, the amount of the differential between the "heavy" and "building" rates, however, to be placed in escrow for payment in accordance with the Commission's ruling; and (c) the rates thereafter to be paid in accordance with the Commission's ruling, with which ruling plaintiff agreed to abide. In view of such agreement and escrow arrangement, the operating engineers agreed to return to work the following day.

As a result, work was resumed on April 12, 1962, with the hearing in Washington before the Commission's Construction Panel also being held that day.

On May 2, 1962, the Commission, finding that "building rates have been paid for Operating Engineers on open cut excavation for launchers and excavation for silos on other missile bases in the same general area and that building rates have been generally paid for comparable excavation work in the area," decided that "the building wage rates for Operating Engineers be applied for the open cut excavation for the launchers, the excavation below the cut for silos and for backfilling." It further stated that: "In making this decision, the Commission makes no interpretation of the application of the Davis-Bacon wage determination to this dispute," and that "The action of the Commission is confined to the present dispute and this single project."

Plaintiff promptly abided by the decision, released the escrow funds, and thereafter paid the "building" rates to the operating engineers and the carpenters. The difference between such rates and the "heavy" rates is the amount of plaintiff's claim.

Upon the completion of the project, and ascertainment of the amount involved, plaintiff, on May 18, 1964, presented to the contracting officer its formal "Claim For Additional Labor Costs Resulting From Decision of Missile Sites Labor Commission Dated May 2, 1962." It contended that "As a result of this decision of the Commission, we were obligated to pay the higher wage rates for operating engineers and carpenters as specified in the wage schedules for building construction" and that such additional labor costs would not have been incurred "if we had been permitted to pay the wage rates specified for these classifications in the heavy construction schedules in accordance with the intent of the contract." Claiming that "The government's action in requiring us to pay these higher wage rates clearly constituted a change in the original contract requirements," thereby entitling it "to an equitable adjustment pursuant to the changes clause of the contract," it requested that such a "change order be issued authorizing reimbursement to us" for such additional costs.

By decision of June 12, 1964, the contracting officer denied the claim, holding

(1) that "precedents in the general area on other missile construction work and comparable excavation work" were, as the Missile Sites Labor Commission held, the controlling factor (as against plaintiff's interpretation "based on Minuteman construction in remote areas (Montana, South Dakota and North Dakota)") and that plaintiff could have ascertained the local situation well before submitting its bid; (2) certain comments made by the government's representative at a prebid conference held on February 23, 1962 (upon which plaintiff was relying in support of its contention that the "heavy" rates were properly applicable), were neither relevant nor, in any event, "contractually binding"; and (3) the "responsibility for obtaining necessary labor" was part of the normal risk a contractor must take "when bidding a competitive fixed-price contract."

On appeal, and after a four-day hearing, the Board held on May 24, 1965, that, whether or not the construction of the missile launchers constituted "heavy" rather than "building" construction within the proper meaning of those terms as used in the Davis-Bacon Act wage determination contained in the contract, plaintiff was not entitled to an equitable adjustment because there was no order of the contracting officer, or any other action taken by the government in its contractual capacity that could be considered to have constituted an order, which caused the payment by plaintiff of the amount in question. Payment of such amount in accordance with the decision of the Missile Sites Labor Commission was, it held, in legal contemplation in the nature of a voluntary act. It therefore concluded that "the appeal must be denied on the ground, that appellant incurred the added expenditures, which it seeks to recover, voluntarily, in response presumably to its own evaluation of the business situation confronting it, and that no action was taken by the Government to cause it increased wage expenditures."[6]

It is clear that, based on this record, the Board's conclusion is correct.

 As a basic proposition, it is settled that contractors can claim no legal rights growing solely out of Davis-Bacon Act minimum wage determinations by the Secretary of Labor, for such provisions are not incorporated in the contract for their benefit. United States v. Binghamton Construction Co., 347 U.S. 171, 74 S.Ct. 438, 98 L.Ed. 594 (1954); Bateson-Stolte, Inc. v. United States, 305 F.2d 386, 158 Ct.Cl. 455 (1962); Bushman Construction Co. v. United States, 164 F.Supp. 239, 143 Ct.Cl. 264 (1958). These determinations of the rates of wages prevailing, on the date of the determination, for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the locality only fix minimum rates which the contractor is obligated to pay and do not amount to actionable representations that contractors will actually, in the course of their future performance, be able to obtain laborers and mechanics at such rates. Indeed, as *Binghamton* flatly holds, recovery is precluded even if the Secretary of Labor's determination misrepresented the rates then actually prevailing. Since the contractor can base no rights on these Davis-Bacon Act determinations, he must make his own investigation in the pertinent locality concerning the labor situation, for, under his fixed price contract, it is his basic obligation and responsibility to supply all of the labor (and materials) required for the prosecution of the work.[7]

---

6. It further held that no recovery could be had with respect to the carpenters in any event because the only claim plaintiff had reserved in its release executed upon completion of the project was that pertaining to the operating engineers.

7. Section GC–3 of "Part I, General Conditions" of the contract provided: *"Site Investigation.* The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, including but

Thus, in cases such as the instant one, where the labor costs claimed to constitute amounts in excess of the Davis-Bacon Act minimum requirements were paid in accordance with proceedings conducted by, and the determination of, a third-party mediation agency, contractors have been permitted to recover such excess amounts only in special and limited types of circumstances. One such situation is where, by the terms of the contract itself, the contractor is required, in the event of a wage dispute, to resort to the third-party agency and to adhere to such directive orders or rulings as that agency might issue. Sunswick Corp. of Del. v. United States, 75 F.Supp. 221, 109 Ct.Cl. 772, cert. denied, 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755 (1948). These situations grew out of the type of contract used during the World War II period. Under Executive Order No. 9250 of October 3, 1942, "Providing for the Stabilizing of the National Economy," the National War Labor Board, established to adjust and settle labor disputes which might interrupt work contributing to the effective prosecution of the war, was authorized to carry out certain wage policies, and such Board, by its General Order No. 13, delegated jurisdiction to the Wage Adjustment Board, established by the Secretary of Labor, over certain labor disputes and wage revisions. During the war the Secretary of Labor's prevailing wage determinations under the Davis-Bacon Act were held to those which were prevailing on July 1, 1942, with adjustments to be made only pursuant to Wage Adjustment Board recommendation. In *Sunswick*, the contract provided (as did the contracts in general use during such period) that the contractor could pay not less or more than the Secretary of Labor's pre-

vailing wage determinations, and that such wages "shall be the maximum wages to be paid, subject, however, to Executive Order No. 9250 and the General Orders and Regulations issued thereunder," and this court interpreted such provisions as requiring the contractor to submit labor disputes to the Wage Adjustment Board and as obligating it to pay such higher wage rates as the Board, under the machinery of Executive Order No. 9250, directed it to pay. In that case, the Board was authorized to and did issue a "directive order" directing the payment of a wage rate higher than the prevailing wage rate specified in the contract, to which the contractor had previously been bound. The court held that the contracting agency (the War Department) had, by the contract provisions, in effect (a) delegated authority to the Wage Adjustment Board to modify the contract provisions as to the wage rates, and (b) agreed that such provisions should be subject to change upon order of the Board, with the contractor thereby becoming entitled to a change order "as in the case of any other change in the specifications authorized by the contract." 75 F.Supp. at 231, 109 Ct.Cl. at 802.

Plainly, the instant situation does not fit into the *Sunswick* mold. Here, the contract made no reference, direct or indirect, to the Missile Sites Labor Commission or the Executive Order creating it, nor is there anything in the contract that could be construed as obligating plaintiff to resort to the Commission at all. Nor did the contract prevent plaintiff from paying amounts in excess of the Davis-Bacon wage determinations. And the Commission's decision was not in the form of a directive order or ruling. The Commission did not order plaintiff to do anything. Its "decision" simply consti-

not restricted to those bearing upon * * * availability of labor, * * *." Rec., Vol. 1, Tab G–3.

Section 13 of the contract's "General Provisions" provided: *"Conditions Affecting the Work.* The Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and

location of the work, and the general and local conditions which can affect the work or the cost thereof. Any failure by the Contractor to do so will not relieve him from responsibility for successfully performing the work without additional expense to the Government. * * *" Rec., Vol. 1, Tab G–2.

tuted a recommendation.[8] Although the Commission was, as shown, authorized to issue "directives" (despite its lack of enforcement powers), its decision herein was not of that type.[9] Indeed, in later decisions the court made plain that it was the "directive order" aspect of the *Sunswick* case that it considered to be the controlling factor, for where the Board's order was instead of the mere permissive type (and there was no order by the contracting officer or other action by the government acting in its contractual capacity requiring the payment of the increased amounts), recovery was denied even though the contract contained the identical provisions as *Sunswick*, the increased wage payments by the contractor in such situations being considered as voluntary rather than contractually obligatory. Irwin & Leighton v. United States, 115 Ct.Cl. 18 (1949); Kirchhof v. United States, 102 F.Supp. 770, 121 Ct. Cl. 476 (1952); Ross Engineering Co. v. United States, 127 F.Supp. 580, 130 Ct. Cl. 368 (1955); F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 131 Ct.Cl. 501 (1955).

The only other situation in which recovery has been allowed in these cases is where the government, acting in its contractual capacity, requires the contractor to pay the higher wage amounts. Thus, an order by the contracting officer to the contractor to pay the increased rates authorized by the Wage Adjustment Board has been held to entitle the contractor to an equitable adjustment, even though the Board's action was of the permissive, and not the directive, type. A. J. Paretta Contracting Co. v. United States, 109 Ct.Cl. 324 (1947), cert. denied, 333 U.S. 832, 68 S.Ct. 458, 92 L.Ed. 1116 (1948). To the same effect is Poirier & McLane Corp. v. United States, 120 F.Supp. 209, 128 Ct.Cl. 117 (1954), where the contracting officer directed the contractor to pay, both retroactively and in the future, the new higher Davis-Bacon Act wage determinations which were issued by the Secretary of Labor during project performance, the Secretary having admitted that his original determination was erroneous and issued by "inadvertence."

■ On the basis of the above considerations, the Board's rejection of plaintiff's contention that the Missile Site Labor Commission's decision alone constituted governmental action compelling plaintiff to pay wages higher than those required by its contract (or the labor market situation), and entitling plaintiff to reimbursement under its contract, was correct. Plaintiff's contract did not, as shown, cast any obligation on plaintiff either to participate in proceedings before the Commission or to adhere to any Commission decision flowing from any such proceedings,[10] nor, although some of plaintiff's officials may have erroneously thought otherwise,[11] was

---

8. After making its findings and "decision," the Commission concluded with the statement that:

 "7. The Commission recommends that the Department of Defense take appropriate action to implement this decision." Rec., Vol. 1, Tab D–4.

9. The Appeals Board appears to have inadvertently erred in stating (Decision, p. 19) that the Commission, unlike the Wage Adjustment Board, "did not have the power * * * to issue directive orders." Section 4 of Executive Order No. 10946 did give it the authority "to issue such directives and to take such other action as the Commission may direct." However, the error is immaterial, since here no such directive was issued.

10. At the Board hearing, in response to a question from the Presiding Board Member as to the existence of any provision of the contract obligating plaintiff to comply with the Commission's procedures or decisions, plaintiff's counsel responded: "There is none." Rec., Vol. 2, Tr. 215–16.

11. Plaintiff's project manager, Mr. McMurren, clearly felt plaintiff was "obligated" to comply with the Commission's procedures and decisions. He testified: "It has always been, was, and is now my impression that I had no choice. It has been explained to me by a variety of people that this was an Executive Order of the President of the United States. We had to comply." Rec., Vol. 2, Tr. 135–36.

plaintiff obligated to so act either under the provisions of the Executive Order establishing the Commission or the terms of the Commission's ruling. Plaintiff's decision to utilize a noncontract mediation service to settle a labor dispute that was interfering with its prosecution of the contract does not entitle plaintiff to an equitable adjustment under the contract for the increased amounts it expended in abiding by the decision of the mediator. No provision of the contract authorizes such an adjustment under such circumstances. The contract did, on the other hand, contain a provision that appears to have been designed for utilization in the solution of a problem such as the instant one. Section SC–6b of "Part II, Special Conditions" provided:

> *Classification of Laborers.* * * *
> In the event the interested parties cannot agree on the proper classification or reclassification of a particular class of laborers and mechanics to be used, the question, accompanied by the recommendation of the Contracting Officer, shall be referred to the Secretary of Labor for final determination. Rec. Vol. 1, Tab L.

See Nello L. Teer Co. v. United States, 348 F.2d 533, 172 Ct.Cl. 255 (1965), cert. denied, 383 U.S. 934, 86 S.Ct. 1065, 15 L.Ed.2d 852 (1966), where the claim, based on the Secretary of Labor's action taken under an identical provision, was denied.

■ Plaintiff, however, asserts that it paid the higher rates only because an authorized representative of the contracting officer (Col. Antonelli) in effect directed it to pay such rates or to suffer the penalties incident to noncompliance with the minimum wage provisions of the contract.[12] The Board found that the record failed to support the contention that there was any such order or directive. Plaintiff attacks such Board finding as being "arbitrary, capricious and unsupported by the evidence." [13]

The Board's conclusion was manifestly correct. Plaintiff's contention is essentially based on a statement allegedly made by defendant's area engineer (who was the contracting officer's authorized representative at the site) on April 10, 1962, the day following the work stoppage, and prior to the hearing before the Commission (on April 12, 1962) and the Commision's decision (May 2, 1962). Plaintiff's Director of Labor Relations (Mr. Knack) testified before the Board that during a discussion he had with the area engineer on April 10, the engineer in substance made the following statement (the engineer was deceased at the time of the hearing):

> * * * regardless of how I may feel on it and regardless of what my opinions might be on the matter, there are predeterminable wages in here and I must administer them, and if someone above me tells me that these are not heavy and highway and someone does tell me that it is building work, then I must say you have to comply with the predeterminable wage rates which are in that specification for building. Rec., Vol. 2, Tr. 226.

This ambiguous and vague testimony is indeed a weak reed upon which to base a conclusion that the contracting officer was in effect abdicating his functions and responsibilities and was ordering plaintiff to make such payments as the Commission might in the future decide should

12. Plaintiff says, in its *Motion For Summary Judgment,* that its "entire case here turns on this very point." (P. 16.) However, in its Response to Defendant's Cross Motion for Summary Judgment, the nub of its case is put somewhat differently: "Plaintiff's case is predicated on the fact that the government intervened, through the President's Missile Sites Labor Commission, to substitute the higher building construction wage rates as contract minimum wage rates after the contract was awarded, and the contracting officer's concurrence in this action constituted a constructive change under the contract." (P. 7.)

13. Plaintiff's Response to Defendant's Cross Motion for Summary Judgment, p. 15.

be made, regardless of the basis or reasons therefor. The Commission, it is noted, is not even mentioned in the statement. All the engineer said was that "if someone above" him ordered him to administer the contract in a certain way, he would obey such orders. The Commission was not "above" the contracting officer, nor did it have anything to do with the administration of the contract. Shortly after the issuance of Executive Order No. 10946 on May 26, 1961, establishing the Commission, the Secretary of Defense, by a memorandum of June 16, 1961 to the Secretaries of the Army, Navy, and Air Force, made plain that, although the Departments were expected to cooperate fully with the Commission, "The machinery established by the Executive Order is designed to assist in eliminating work stoppages and uneconomical practices at missile sites. The proposed machinery is not intended to relieve military departments from their normal contract administration responsibilities and duties."[14] And this was "reemphasize[d]" in substantially verbatim language by another memorandum of July 19, 1961, which further stated, in insisting upon the Departments' exercising their "normal contract administration responsibilities," that: "The machinery created by the Executive Order is designed to assist Departmental efforts, not to displace them."[15]

That plaintiff voluntarily entered into the Commission proceedings and complied with the Commission's ruling only after a considered decision on its part, and understood that it was doing so without the compulsion of any order or requirement of, or authoritative interpretation by, the contracting officer, is made clear by a review of its contemporaneous actions.

From the beginning, plaintiff gave every indication of its desire to coop-

erate with the Commission and thus, by resorting to its mediation services, avoid work stoppages which, in addition to public interest and national security considerations, could obviously be costly to it as a contractor. At the first meeting of the local Missile Site Labor Relations Committee on March 28, 1962,[16] which plaintiff and certain of the interested unions (and others) attended, the Chairman, a federal mediator stationed at Kansas City, Missouri, gave the background of Executive Order No. 10946 establishing the Commission. Among other things, he emphasized that the creation of the Commission did not preclude the use of customary and traditional procedures for the settlement of labor disputes, but he urged that disputes not so susceptible to resolution be submitted to the Committee. The "heavy" vs. "building" difference of opinion had by that time become evident, but both plaintiff and the Operating Engineers Union gave assurances that they would attempt, by conference, to settle the matter themselves. When, as noted, this attempt failed at the April 9 meeting, with the resulting work stoppage, the parties to the dispute then again appeared before the Committee on April 11, the principal concern at that time being the resumption of operations pending the Commission's decision. This purpose was, as stated, accomplished by the above-described escrow arrangement and agreements. And at this meeting, plaintiff, as part of such agreements, gave the union and the Committee specific assurances that it would abide by the ruling of the Commission.[17] There is no indication that, in entering into such agreements and giving such assurances, it was acting under the supposed compulsion of a contracting officer's order issued the previous day, i. e., the conversation upon which plaintiff now so heavily relies.

14. App.Ex. A–7.

15. App.Ex. A–8.

16. Rec., Vol. 1, Tab E–4.

17. Rec., Vol. 1, Tab E–3, p. 3. As shown, under the agreements, the escrow arrangement was not made retroactive, so that, regardless of the Commission's decision, plaintiff's obligation up to the date of the work stoppage was considered to have been fulfilled by the "heavy" rates which it had paid.

On the other hand, it seems plain that plaintiff too was anxious to avoid a lengthy work stoppage and was, by the escrow arrangement and agreements. assuring the Committee of its cooperation with the Commission and the union of its intention to abide by the Commission's ultimate ruling. Without the escrow arrangement and plaintiff's agreement to comply with the ruling of the Commission should it decide in favor of the union, the work stoppage would have undoubtedly continued, for only when the arrangement and agreements were arrived at did the employees return. Plaintiff may have acted as it did under the compulsion of economic, or practical, or other considerations, but certainly not under the compulsion of a contracting officer's order or directive.

Further making it plain that plaintiff was not at the time laboring under any belief that compliance with the forthcoming Commission ruling was being required by the contracting officer, plaintiff, on April 28, 1962, while the matter was still pending before the Commission, wrote to the Commission presenting further arguments in support of its contention that the "heavy" construction rates in the Davis-Bacon Act wage determinations were applicable, and stated:

> * * * If we are directed to pay these higher [building] rates we must insist that appropriate adjustment in the contract price be made to compensate for the additional costs involved. Accordingly, the Commission's intended ruling should contain a clear and definite directive to the contracting officer on this point so that the contractual rights which we have in this matter will be fully preserved. Further, an advance opinion should be obtained from the Comptroller General stating that his office would not be constrained to object to such a contract modification by the contracting officer.[18]

Surely, if plaintiff felt that it already had an April 10 order of the contracting officer, such as it now claims, it would hardly, on April 28, be seeking from the Commission a directive to the contracting officer to issue such an order.

Still further, as plaintiff's project manager, Mr. McMurren, himself testified, it was defendant's area engineer who informed him, on May 2, 1962, of the Commission's decision and inquired concerning the course of action plaintiff would take, an inquiry that would have been quite academic if the engineer had in effect already ordered compliance on April 10. The Commission's ruling did not, as heretofore noted, contain any directive to the contracting officer such as plaintiff had requested (or indeed any directive to anyone). And McMurren immediately replied that, in accordance with what he considered plaintiff's obligation to be, plaintiff would release the escrow money and thenceforth pay the "building" rates. Rec., Vol. 2, Tr. 180–81. McMurren further checked the matter with plaintiff's Director of Labor Relations and plaintiff's vice president (who was also plaintiff's Los Angeles district manager), both of whom agreed with McMurren's conclusion. And this conclusion was formally reaffirmed a week later when, on May 9, 1962, at a meeting of the local Missile Site Labor Committee, McMurren advised that, as a result of the Commission's ruling, plaintiff was "discharging" its "monetary obligation" and that "the President's Commission decision will in no way alter their [plaintiff's] desire to work in harmony and cooperate to the fullest with all labor groups and that they [plaintiff] accept the Commission's decision and will work under the terms of their [plaintiff's] agreement." [19]

When, some two years later, plaintiff on May 18, 1964, first formally presented to the contracting officer its claim herein, it said nothing about any such April 10, 1962 order of the area engineer as it now relies upon. Instead, in contending that the project should, "in accordance with the intent of the contract,"

18. App.Ex. A–19, pp. 3–4.

19. Rec., Vol. 1, Tab E–2, p. 4.

properly be classified as "heavy" construction, it relied on certain statements made by a government representative at a prebid conference on February 23, 1962, as well as on work classifications on previous Minuteman projects in other parts of the country. And it argued that, "as a result of" the Commission's decision "we were obligated to pay the higher rates," and that "The Government's action in requiring us to pay these higher wage rates clearly constituted a change in the original contract requirements and entitles us to an equitable adjustment pursuant to the changes clause of the contract." [20] In denying the claim, the contracting officer, of course, addressed himself to plaintiff's contentions, so that no mention of or reference to any April 10, 1962 alleged directive by the area engineer was made.[21] The complaint filed with the Appeals Board again followed the lines of its claim with the contracting officer, emphasizing the "representations" made at the February 23, 1962, prebid conference, but failing even to mention the April 10, 1962 "order" of the area engineer upon which it now relies.

Thus, the record fails to disclose any such order to plaintiff by the contracting officer or any authorized representative [22] to pay the "building" rates as would support plaintiff's claim to an equitable adjustment. Indeed, what the record does disclose is that, after the Commission's decision, defendant's responsible officials, in response to the Commission's recommendation in its ruling "that the Department of Defense take appropriate action to implement this decision," met on May 15, 1962 specifically to consider what, if any, implementation of the Commission's decision was required. However, it was concluded that, since plaintiff was already paying the higher rates pursuant to its own agreement with the union, and since plaintiff had not been instructed by the contracting officer to pay such rates, no implementation by the Department was required. Under the circumstances, any amendment of the contract to require the payment of such rates would, it was concluded, be "academic." [23]

Based on the above review of the record, the Board's conclusion that the area engineer's April 10, 1962 statement, upon which plaintiff relies, did not "constitute a directive, order, or formal interpretation of the contract that the building rate was the minimum wage for operating engineers performing launcher construction work" (Rec., Vol. 1, Bd. Op., p. 18) was in no way arbitrary or capricious.

Plaintiff can hardly contend that its payment of the "building" rates was due

---

20. Rec., Vol. 1, Tab C, p. 3.

21. Rec., Vol. 1, Tab B.

22. In further support of its contention that it acted under compulsion, plaintiff points to the testimony of the Chief of the Labor Relations Branch (Tr. 305) of the Corps of Engineers Ballistic Missile Construction Office (the contracting agency) to the effect that, had plaintiff not complied with the Commission's ruling, he would have personally considered plaintiff to have been in violation of the Davis-Bacon Act wage determinations contained in the contract specifications (Tr. 379–81). However, it is plain that this testimony in no way strengthens plaintiff's legal position. First, it is based on speculation as to what would have happened had plaintiff not adhered to its agreement with the union to abide by the Com-

mission's decision. There is no showing that plaintiff acted as it did on the basis of any discussion with or order of this official prior to its decision to adhere to the Commission's ruling. Furthermore, it is not shown that this official had any *authority to make binding contract rulings.* He himself was careful to point out that all he could have done was to "report this matter to the Office of the Chief of Engineers, giving all of the facts at hand and ask for a ruling. I would give them the position of the Contractor, and my position, and ask for a ruling." Tr. 381.

23. Resp.Ex. B–3, "Diary—15 May 1962." It was also concluded that, in any event, "there was no authority to amend a lumpsum contract to require the payment of rates higher than those specified in the contract." Id.

in any way to any outstanding "formal interpretation" by the contracting officer or his authorized representative, the area engineer, that such rates properly applied to the launcher work. On the other hand, McMurren specifically testified that, although it was the area engineer's "personal feeling" that the work constituted "heavy" construction, the engineer did not, prior to or during the dispute, make any "official ruling" on the matter since "He had to remain impartial because of his position." Tr. 180.

In additional support of its contention that the area engineer was committed to follow and enforce the Commission's decision, plaintiff points to the subsequent action he took in denying its request for an extension of time due to the strike. Plaintiff relies on the engineer's statement in his denial letter of May 25, 1962 (signed as the "Authorized Representative of the Contracting Officer"), that: "* * * as a result of the ruling handed down by the President's Missile Sites Labor Commission, it appears that the Operating Engineers were in the right." (App. Ex. A–13, p. 2.) This statement, coming after plaintiff's own decision to comply, could not, of course, have served as a basis for such compliance. In any event, the letter itself makes clear that the sentence relied on is of little significance. First, the denial was also based upon the fact that, during the period of the work stoppage, the sites upon which work was then in process were relocated, with plaintiff's already having received appropriate time extensions with respect to such relocation which "took into consideration the time spent to accomplish the construction already completed and that required to regain the position in the proper completion sequence." Thus, a basic reason for denying the request was, in the engineer's words, "the fact that labor dispute and site relocation were coincidental." Second, as a result of such considerations, the engineer concluded by stating: "Accordingly, you are requested to withdraw your time extension claim and such claim will be considered withdrawn unless additional information and/or justification is received within 15 days from the date of this letter." Plaintiff points to nothing in the record to indicate that it pursued the matter any further either by way of submitting further data or appealing, thus indicating, if anything, acquiescence. Since it appears, therefore, that the engineer's statement was contained in a ruling which was still subject to further consideration upon the submission by plaintiff of "additional information and/or justification," that there were also other bases for the denial, and that in any event the request upon which the ruling was based may fairly be considered to have been withdrawn leaving nothing of any legal effect outstanding, such statement cannot be given important weight.

■ For still another reason must recovery fail. A prerequisite to recovery under both the *Sunswick* and *Paretta* doctrines is proof by the contractor that, but for the directive orders of the mediation agency (*Sunswick*) or the contracting officer (*Paretta*), the contractor would have been able to obtain the required labor at the lower rates. However, the Appeals Board here expressly held that, on the basis of the record, no finding could properly be made that, but for the Commission's decision, plaintiff would have been able, despite the adamant positions taken by the Operating Engineers and Carpenters Unions, to hire operating engineers and carpenters at the minimum "highway" rates, and that it would have done so.[24] Plaintiff

24. As the Board stated: "Even if for purposes of this appeal we assume that the heavy construction rate was the contractual minimum wage rate payable to operating engineers for the disputed work, this avails appellant nothing, unless it would have been able to hire operating engineers for the disputed work at the minimum rate. In the light of what actually transpired, it will always be impossible to know with certainty whether appellant would have been able to do so." Bd.Op., p. 17.

disputes this conclusion and contends that, on the basis of the record, the Board should have made such findings.

Plaintiff's contention is based upon its unsupported testimony that another union, the Teamsters, had assured plaintiff that it would be able to supply men to perform the operating engineers' work at the minimum "heavy" rates. But the Board observed that, if plaintiff did indeed have such assurances, and the Teamsters Union could in fact have furnished labor to perform such tasks at such rates, there was no apparent reason why plaintiff did not, when the Operating Engineers Union called the strike, go ahead and obtain the necessary replacements from the Teamsters Union. Had plaintiff elected to take this course of action and the Teamsters Union was able to supply the necessary men, there would, according to plaintiff, have been no work stoppage. The fact that plaintiff did not take this course but instead negotiated with the Operating Engineers Union and terminated the strike by the escrow arrangement and its agreement to abide by the Commission's decision, caused the Board to conclude that "The record may, therefore, well be deemed persuasive of the proposition that appellant would not have been able to man the job without accepting the wage scale demanded by the operating engineers * * *." (Bd. Op., p. 17.) This was a wholly reasonable conclusion. It certainly was not arbitrary or capricious.[25]

Plaintiff again contends, as it did before the Board, that the construction of the missile launchers actually constituted "heavy" construction within the proper

meaning of the Davis-Bacon Act contract provisions, that the Appeals Board in effect so found, and that the Missile Sites Labor Commission erred in holding otherwise. In view of the conclusion that plaintiff paid the amount here in dispute voluntarily and not pursuant to any order of the contracting officer or formal interpretative ruling by him that the work in question did in fact constitute "building" work, it is not, as the Board held, necessary to decide the question of the proper interpretation of the Davis-Bacon Act provisions. At any rate, it is plain that neither the Appeals Board nor the Commission made such contract interpretations as plaintiff claims. As previously indicated, the Commission expressly stated that: "In making this decision, the Commission makes no interpretation of the application of the Davis-Bacon wage determination to this dispute" and that "The action of the Commission is confined to the present dispute and this single project." The basis for its decision was that building rates had been previously "paid for Operating Engineers on open cut excavation for launchers and excavation for silos on other missile bases in the same general area and that building rates have been generally paid for comparable excavation work in the area." As the Board held, the Commission "was purely a labor dispute conciliating agency" (Bd. Op., p. 19) and had no power to make binding contract interpretations.

Nor did the Appeals Board make any finding that the disputed work properly constituted "heavy" construction within the meaning of the Davis-Bacon Act pro-

---

25. The different unions did not necessarily have common interests in the "heavy" vs. "building" controversy. For instance, under the Common Laborers' collective bargaining agreement with the Missouri Associated General Contractors, this class of labor was entitled to higher rates on "heavy" work. (Bd.Op., p. 11.) Similarly, the "heavy" construction wage rates for teamsters was higher than the "building" construction rates. (Tr. 473.) Thus a determination that the disputed work fell into the "heavy" category would not have led to lower labor rates for all classifications (see Bd.Op., p. 11) and this fact may well have caused plaintiff to proceed as it did with the Operating Engineers Union. The record does not show whether, had the disputed work been placed in the "heavy" category, how much plaintiff's increased expenses would, on an overall basis, have been. Plaintiff merely asks for the increased rates on two labor categories, without giving any balancing consideration to the other categories.

visions. While "it may well be true," it said, that payment of the "heavy" rates would have satisfied plaintiff's contract obligations and that "[t]he preponderance of the evidence" supported plaintiff's contention as to the type of structure which was generally regarded in the State of Missouri as falling within the term "building construction" (the only expert testimony on this subject being plaintiff's), and that, therefore, had the contracting officer issued a decision that plaintiff had to pay the "building" construction rates for the launcher work, "we might well consider such an interpretation as erroneous," it nevertheless held that it was unnecessary for it to make any such finding because of its holding that the contracting officer had never in fact made such a decision. That plaintiff fully understood that the Board had not made any such finding in its favor is shown by its "Request For Reconsideration And For A Specific Finding of Fact" (contained in Rec., Vol. 1), which was expressly directed to the point. Plaintiff argued that it was contractually entitled to a finding by the Board on the "heavy" vs. "highway" contract interpretation issue since, as it conceded, if the disputed work actually constituted "building" construction, it would not be entitled to recover. The Board, however, again refused to make a finding which it considered to be "immaterial to the decision." (Decision on Motion for Reconsideration, p. 2, contained in Vol. 1). Surely plaintiff errs when it states that " * * * the ASBCA found that the launcher construction was

heavy construction and therefore subject to the heavy construction wage schedule." (Plaintiff's Response to Defendant's Cross Motion For Summary Judgment, p. 14.)

Certainly the statements of the government representative at the precontract conference of February 23, 1962,[26] which plaintiff has variously stressed, to the effect that "Minuteman construction is normal heavy construction * * * " (Rec., Vol. 1, Tab E–5, pp. 2, 6), are of no significance, legal or otherwise. The statements were parts of general, nontechnical, nonlegal descriptive comments without any attempt to separate the various components of the project work into "heavy" or "building" classifications in the sense of Addendum No. 7, which had not as of that date even been issued. In their breadth they were clearly inaccurate, for even plaintiff concedes, and never contended otherwise, that the control center structures were properly classified as "building" construction. At any rate, the official had commenced the conference with the explicit statement that "At the outset, I wish to call your attention to our Standard Form 22, Instructions to Bidders, from which I quote: 'Oral explanations or instructions given before the award of contract will not be binding.' " (Id., pp. 1–2.) And the contract specifically disclaimed responsibility by defendant "for any understanding or representations" made by any official "prior to the execution of this contract."[27]

Insofar as proper interpretations of the Davis-Bacon Act provisions are con-

---

26. The statement was made by Col. C. C. Noble (Rec., Vol. 1, Tab E–5, p. 1) who later became the contracting officer. Rec., Vol. 1, Tab G, p. 2a.

27. This language was contained in Section GC–3 of "Part I, General Conditions," which provided in pertinent part:

"*Site Investigation.* * * * The Government * * * assumes no responsibility for any understanding or representations made by its officers or agents during or prior to the execution of this contract, unless (i) such understanding or representations are expressly stated in

the contract and (ii) the contract expressly provides that the responsibility therefor is assumed by the Government. * * * " Rec., Vol. 1, Tab G–3.

It was also contained in Section 13 of the "General Provisions," as follows:

"*Conditions Affecting The Work.* * * * The Government assumes no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of this contract, unless such understanding or representations by the Government are expressly stated in the contract." Rec., Vol. 1, Tab G–2.

cerned, the Department of Labor's own interpretation would obviously be of greater pertinence than the above-mentioned precontract conference statements upon which plaintiff relies and which were not even addressed to the specific point. And the record shows that the Solicitor of the Department, in direct response to plaintiff's inquiry, had advised plaintiff's Director of Labor Relations, by letter of August 29, 1961, which was well before plaintiff bid on this project, that "So far as the rates established at missile sites are concerned, we have carefully considered the character of the work of building upward within missile silos underground and believe we must reaffirm as sound our conclusion that this work, requiring as it does the advanced skills of all crafts in the building construction industry, is properly classified as commercial or industrial building construction." [28] This interpretation by the Solicitor of the Department of Labor undoubtedly explains why plaintiff chose not to avail itself of the procedure specified in Section SC–6b of the contract, hereinabove referred to, for the submission of labor classifica-

tion disputes "to the Secretary of Labor for final determination." Had such procedure been followed, the Secretary of Labor's decision would not have been subject to judicial review. Nello L. Teer Co. v. United States, supra.

That plaintiff may have, after its receipt of Addendum No. 7 on March 10, 1962, reduced its bid in the belief that, under the Addendum, the disputed work should be properly classified as "heavy" construction (plaintiff initially prepared its bid on the disputed work on the basis of "building" rates (Bd. Op., p. 7 [29]))is, in the absence of the necessity to determine such proper classification, and, therefore, the propriety of its action, irrelevant, although why plaintiff should have decided to take any such action in the face of the Department of Labor's hereinabove mentioned contrary interpretation is puzzling.[30] In any event, the Board refused to find what part of the bid reduction, if any, was related to Addendum No. 7. (Bd. Op., pp. 7–8). The Board's refusal was justified. An examination of plaintiff's estimate and papers relating to the preparation of plaintiff's bid showed that, in the prepa-

---

28. Rec., Vol. 1, Tab N. The value of the electrical work in the launchers on the project was over $7,000,000, and that of the mechanical work, over $3,000,000. (Letter of January 7, 1965, from plaintiff's counsel to the Board, included in Rec., Vol. 1.)

In addition, the Secretary of Labor, by letter of August 23, 1961, advised a Senator who was making an inquiry on behalf of the Associated General Contractors of Missouri, which organization was suggesting the use of the "heavy" rates for the forthcoming Whiteman project, that the "heavy" vs. "building" problem "has existed since the very beginning of the missile site program"; that in early 1959 a dispute arose at the Titan base near Denver between the Morrison-Knudsen Company and the unions on the issue, with the parties agreeing to abide by the Department of Labor's ruling; that the Department, "[b]ased on an extensive study, and following a hearing," concluded that "missile site construction was, generally speaking, of a nature similar to building construction"; and that it was the Department's practice, however, to "ascer-

tain and issue those rates which actually prevailed for the type of construction involved in the area concerned." (Resp.Ex. B–2.) The letter went on to explain in detail why "missile installations are more nearly like underground buildings."

29. Memorandum to the Board dated January 7, 1965, entitled "Report of Examination," contained in Rec., Vol. 1.

30. In addition, in answer to an inquiry of July 26, 1961, by the Associated General Contractors of Missouri (of which plaintiff was a member), the Chief of the Labor Relations Branch of the Corps of Engineers Ballistic Missile Construction Office, by letter of August 8, 1961, advised: "As you know, there is no definite pattern covering the type of construction at the missile sites. At some sites, building construction rates have been used throughout the project. At other sites, a portion of the work has been accomplished under heavy and highway rates. This is a matter that properly should be determined by existing local practices in the area." App. Ex. A–21.

ration of the final bid, there were several reductions made in the original estimate, including a reduction in the estimated labor costs for operating engineers. However, the reduction was far from the amount now claimed, nor was there any indication in the papers of any connection between the Addendum and the reduction.[31] Last-minute reductions in bids, made for a variety of reasons, are not, of course, uncommon.

For all of the reasons hereinabove set forth, plaintiff's motion for summary judgment should be denied, defendant's cross-motion granted, and the petition dismissed.[32]

---

31. Memorandum dated January 7, 1965, entitled "Report of Examination of MHPL's [Morrison-Hardeman-Perini-Leavell] Estimate and Related Papers," prepared and submitted to the Board in accordance with the order of the Presiding Member at the hearing, and contained in Rec., Vol. 1.

32. As the Board held (Op., p. 21), the increased wages paid to the carpenters are not in any event recoverable since that part of the claim was released. The final release executed by plaintiff merely reserved :

"A claim arising out of a written decision dated 2 May 1962 by the President's Missile. Sites Labor Commission regarding the application of wage rates for operating engineers." Rec., Vol. 1, Tab M.